David S. Casey, Jr., SBN 060768
 *dcasey@cglaw.com*
Gayle M. Blatt, SBN 122048
 *gmb@cglaw.com*
Jeremy Robinson, SBN 188325
 *jrobinson@cglaw.com*
P. Camille Guerra, SBN 326546
 *camille@cglaw.com*
Michael J. Morphew, SBN 304463
 *mmorphew@cglaw.com*
**CASEY GERRY SCHENK FRANCAVILLA**
 **BLATT & PENFIELD, LLP**
110 Laurel Street
San Diego, CA 92101
Tel.: 619.238.1811; Fax: 619.544.9232

Todd A. Walburg (SBN 213063)
 *twalburg@baileyglasser.com*
**Bailey & Glasser LLP**
1999 Harrison Street, Suite 660
Oakland, CA 94612
Tel.: 510.272.8000; Fax: 510.463.0291

Benjamin L. Bailey (*Pro Hac Vice Pending*)
 *bbailey@baileyglasser.com*
Jonathan D. Boggs (*Pro Hac Vice Pending*)
 *jboggs@baileyglasser.com*
**Bailey & Glasser LLP**
209 Capitol Street
Charleston, West Virginia 25301
Tel.: 304.345.6555; Fax: 304.342.1110

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Michael J. Imhoff, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Ford Motor Company, a Delaware corporation,<br><br>Defendant. | Case No. **'22 CV 1019 MMA MSB**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1

Plaintiff Michael Imhoff, ("Plaintiff"), on behalf of himself and all others similarly situated, brings this action against Ford Motor Company ("Ford" or "Defendant"). Plaintiff alleges the following based on personal knowledge as to his own acts, information, and belief, and on the investigation conducted by his counsel as to all other allegations:

## I.    NATURE OF THE ACTION

1.    Ford advertises its 2021 Ford Expedition vehicles as "designed with you and your family in mind," and its 2021 Lincoln Navigator as "Every aspect of the Navigator experience is designed with your serenity in mind."[1,2] In reality, these vehicles have a serious risk of erupting in flames, posing a grave threat of both severe property damage and physical harm—or even death—to drivers and passengers, prompting Ford to issue Recall No. 22S36, and submit a recall to the National Highway Traffic Safety Administration ("NHTSA"), NHTSA Recall No. 22V-346 ("Recall") on May 17, 2022.[3]

2.    In the course of normal use, Class Vehicles may erupt in fire under the hood (the "Defect"). The risk of fire is present regardless of whether the ignition is turned on or off. The Defect is inherent in each Class Vehicle and was present at the time of sale.

3.    The fires in the vehicles mentioned herein—model year 2021 Ford Expeditions and Lincoln Navigators built between July 27, 2020 and August 31, 2021 (the "Class Vehicles")—originate under the hood of the vehicle.[4] Initially, Ford failed to

---

[1] 2021 Ford Expedition [brochure], Ford (2020), https://cdn.dealereprocess.org/cdn/brochures/ford/2021-expedition.pdf (last visited June 22, 2022);

[2] 2021 Lincoln Navigator [brochure], Ford (2020), https://www.lincoln.com/aemservices/brand/api/nameplate/brochure?region=US&make=Lincoln&model=Navigator&year=2021 (last visited June 22, 2022).

[3] Although Ford issued a Recall, and a potential remedy, the vehicles have not yet been fixed. As a result, Plaintiff and Class Members do not have use of their Class Vehicles as bargained for at point of sale.

[4] Exhibit A: Safety Recall Notice 22S36 / NHTSA Recall 22V346 – dated May 2022.

2

disclose the cause of the fires—simply stating its "investigation is ongoing at this time"[5] Further, Ford advises "You should park your vehicle outside away from structures and other property immediately."[6]

4. On July 8, 2022, Ford announced it believed it identified the cause of the underhood fires and a potential remedy.[7] However, depending on the Class Vehicle's cooling fan system, according to Ford, parts needed to repair approximately two-thirds of the vehicles will not be available until September 2022.[8,9] Even if an accurate projection, it is unknown when repairs will be accomplished and whether the risk will be wholly mitigated.

5. For owners unable to park their vehicles outside or away from other structures and property, Ford states the Class Vehicle's "negative battery cable should be disconnected and securely positioned to the side."[10] The procedure includes disconnecting the negative cable from the vehicle's battery, applying four layers of electrical tape over the end of the negative cable, and using a plastic tie strap to secure the cable.[11] This effectively disables the vehicle, making it unusable to the owner unless and until the procedure is reversed.

---

[5] NHTSA Part 573 Safety Recall Report 22V-346, submitted May 17, 2022; https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V346-3365.PDF (last visited July 13, 2022).

[6] Exhibit A, *supra*, note 4 (emphasis in original).

[7] *Ford Motor Company Identifies Remedy for Under Hood Fire Recall*, Ford (July 8, 2022), https://media.ford.com/content/fordmedia/fna/us/en/news/2022/07/08/ford-identifies-remedy-expedition-navigator.html (last visited July 12, 2022).

[8] *Id.*

[9] Associated Press, *Ford Lincoln Navigator, Expedition recall expanded, owners should park outside*, Advance Local Media (July 10, 2022), https://www.al.com/business/2022/07/ford-lincoln-navigator-expedition-recall-expanded-owners-should-park-outside.html (last visited July 12, 2022).

[10] New Vehicle Demonstration / Delivery Hold – Safety Recall 22S36, Ford (May 27, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCMN-22V346-9251.pdf (last visited June 21, 2022).

[11] *Id.*

6.      Unfortunately, vehicle fires are an ongoing threat to consumer safety and property. In 2020, alone, there were 1,500 injuries and 580 deaths stemming from highway vehicle fires.[12] Despite this sobering data, Ford sold and leased approximately 66,221 Class Vehicles with the defect that can add to the number of vehicle fire injuries and deaths.[13] At least one person, according to Ford, was potentially injured (burned) as a result of this Defect.[14]

7.      Ford is well experienced in the design and manufacture of vehicles. As an experienced vehicle manufacturer, Ford conducts quality control and pre-sale testing to ensure its vehicles are free from defects and align with its specifications. This should have included the printed circuit boards Ford believes are the cause of the underhood fires.[15] As such, Ford knew or should have known the Class Vehicles were plagued by the current Defect and presented serious safety risks.

8.      Plaintiff and Class Members purchased or leased vehicles that, at the time of purchase or lease, were of a lesser standard and quality than represented and were not fit for the ordinary purpose of providing safe transportation. Plaintiff and Class Members would have paid less for their vehicles had they known of the Defect. Plaintiff and Class Members have suffered damages in that they lost the benefit of their bargain, overpaid for their Class Vehicles, suffered diminution in value of their Class Vehicles, loss of use of their Class Vehicles, as well as incurred out-of-pocket expenses related to loss of use of the Class Vehicles.

---

[12] Marty Ahrens and Ben Evarts, Fire Loss in the United States During 2020, National Fire Protection Association, pg. 5 (September 2021), https://www.nfpa.org/-/media/Files/News-and-Research/Fire-statistics-and-reports/US-Fire-Problem/osFireLoss.pdf (last visited June 27, 2022).

[13] NHTSA Part 573 Safety Recall Report 22V-346, *supra*, note 5; *Ford Motor Company Identifies Remedy, supra*, note 7.

[14] Chronology of Defect, NHTSA, https://static.nhtsa.gov/odi/rcl/2022/RMISC-22V346-1971.pdf (last visited June 21, 2022); Andrew Krok, *Ford Recalls 39,000 Expedition, Navigator SUVs for Engine Fires*, CNET (May 19, 2022), https://www.cnet.com/roadshow/news/ford-expedition-lincoln-navigator-recall-engine-fires/ (last visited June 21, 2022).

[15] *Ford Motor Company Identifies Remedy, supra,* note 7.

## II.    PARTIES

9.    **Plaintiff Michael Imhoff** is a resident of San Diego, California, in San Diego County. Plaintiff Imhoff (and his wife) purchased a new 2021 Ford Expedition in San Diego on or about May 21, 2021. The value of his Class Vehicle has been diminished as a result of the Defect. Since learning about the Defect, Plaintiff no longer uses the vehicle for the main reasons it was purchased—camping and road trips—due to the increased risk of fire. Plaintiff also parks the vehicle further away from his house, as instructed by Ford. If Plaintiff Imhoff had known about the Defect, he would not have purchased the Class Vehicle or would not have paid as much for it.

10.    **Defendant Ford Motor Company** is a Delaware company, with its corporate headquarters located at One American Road, Dearborn, Michigan. Ford designs, engineers, manufactures, markets, services and/or sells vehicles under the Ford and Lincoln names with the knowledge and intent to market, sell, and lease them throughout the United States. Ford also developed and distributed the owners' manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the Class Vehicles, with the intent that such documents should be distributed throughout the United States. Ford engages in interstate commerce by selling vehicles and parts through its authorized dealers located in every state of the United States, including within this District, and California in particular where Ford ranks third in overall new car market share.[16]

## III.    JURISDICTION AND VENUE

11.    This court has jurisdiction over Plaintiff's and the Class Members' claims pursuant to 28 U.S.C. § 1332(a) because: (a) the proposed Class Members are citizens of a

---

[16] Brett Foote, *Ford Brand Had Eight Percent Market Share In California For 2021*, Ford Authority (February 28, 2022), https://fordauthority.com/2022/02/ford-brand-had-eight-percent-market-share-in-california-for-2021/#:~:text=With%20a%20market%20share%20in,and%20Honda%20at%2010.8%20percent. (last visited June 21, 2022); *California Auto Outlook*, California New Car Dealers Association, pg. 3 (May 2021), https://www.cncda.org/wp-content/uploads/Cal-Covering-1Q-21.pdf (last visited June 21, 2022).

state diverse from Defendant's citizenship; and (b) the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

12.    In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all the claims are derived from a common nucleus of operative facts and are such that Plaintiff would ordinarily expect to try them in one judicial proceeding.

13.    This Court has personal jurisdiction over Defendant pursuant to 18 U.S.C. § 1965(d) because it is registered to transact business in the State of California and transacts business in this District.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (c)(2) because Defendant's contacts are sufficient to subject it to personal jurisdiction in this District, and therefore, Defendant resides in this District for purposes of venue, or under 28 U.S.C. § 1391(b)(2) because certain acts giving rise to the claims at issue in this Complaint occurred, among other places, in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    The Class Vehicle Recall

15.    On May 17, 2022, Ford issued Recall No. 22S36 for 39,013 Class Vehicles.[17] Ford states that on Class Vehicles, "an underhood fire may occur either when the engine is on, or while the vehicle is parked and the engine is off."[18] "An under hood vehicle fire can increase the risk of personal injury and damage to surrounding structures or property."[19] Until very recently, it was believed that the root cause of the fires was still being investigated. Then, on July 8, 2022, Ford announced it believed it identified the cause of the underhood fires and a potential remedy, parts for some vehicles will not be

---

[17] NHTSA Part 573 Safety Recall Report 22V-346, *supra*, note 5.

[18] Exhibit A, *supra*, note 4.

[19] Exhibit A, *supra*, note 4.

available for approximately two months, and that the total number of Class Vehicles expanded to 66,221.[20]

16.    The following is a chronology of events:

a.    March 24, 2022—Ford's Critical Concern Review Group (CCRG) opened an investigation as a result of eight reports of underhood engine fires and one report of a melted battery junction box on Class Vehicles.[21] The investigation continued throughout April, and included vehicle inspections, field and connected data analyses, and product design reviews.[22]

b.    May 12, 2022—Ford's CCRG was aware of 16 reported underhood fires on Class Vehicles.[23]

c.    May 13, 2022—Ford's Field Review Committee approved advising owners to park Class Vehicles outside and away from structures while Ford continued its investigation.[24]

d.    May 18, 2022—the NHTSA sent a confirmation letter to Ford regarding the recall.[25]

e.    May 19, 2022—Ford issues "NEW VEHICLE DEMONSTRATION / DELIVERY HOLD – Advance Notice – Safety Recall 22S36" to

---

[20] *Ford Motor Company Identifies Remedy, supra,* note 7.

[21] Jon Linkov, *Ford Expedition and Lincoln Navigator Recalled for Fire Risk*, Consumer Reports (May 19, 2022), https://www.consumerreports.org/car-recalls-defects/ford-expedition-and-lincoln-navigator-recalled-for-fire-risk-a1081224865/ (last visited June 21, 2022).

[22] Chronology of Defect, NHTSA, *supra*, note 14.

[23] *Id.*

[24] *Id.*

[25] Alex Ansley, Chief Recall Management Division, NHTSA (May 18, 2022), https://static.oemdtc.com/Recall/22V346/RCAK-22V346-9658.pdf (last visited June 21, 2022).

U.S. Ford and Lincoln Dealers, advising of the affected vehicles, reason for the safety recall, service action, and service action.[26]

f.  May 23, 2022—Ford Issues Supplement #1 to the NEW VEHICLE DEMONSTRATION / DELIVERY HOLD – Advance Notice – Safety Recall 22S36, with additional information regarding rental vehicles and claiming information.[27]

g.  May 27, 2022—Ford issues NEW VEHICLE DEMONSTRATION / DELIVERY HOLD – Safety Recall 22S36 emphasizing in bold red type for owners to be instructed to park vehicles outside and away from structures and other vehicles (and no longer referred to as "Advance Notice");[28]

h.  July 8, 2022, Ford announced it received reports of 21 underhood fires, and it believes it identified the cause of the fires and an alleged remedy, though parts for many vehicles are not yet available.[29]

17.    Despite knowing the serious risk for potential injury to individuals and property damage, Ford has not offered to provide loaner vehicles to Plaintiff or Class

---

[26] NEW VEHICLE DEMONSTRATION / DELIVERY HOLD - Advance Notice – Safety Recall 22S36, Ford (May 19, 2022), https://static.oemdtc.com/Recall/22V346/RCMN-22V346-2624.pdf (last visited June 21, 2022).

[27] NEW VEHICLE DEMONSTRATION / DELIVERY HOLD - Advance Notice – Safety Recall 22S36 - Supplement #1, Ford (May 23, 2022) https://static.oemdtc.com/Recall/22V346/RCMN-22V346-5858.pdf (last visited June 21, 2022).

[28] NEW VEHICLE DEMONSTRATION / DELIVERY HOLD - Safety Recall 22S36, Ford (May 27, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCMN-22V346-9251.pdf (last visited June 21, 2022)

[29] *Ford Motor Company Identifies Remedy, supra,* note 7.

Members in conjunction with the recall unless there are unique circumstances—and only then while the vehicle is at a dealership.[30]

18.    Instead, Ford "has not issued instructions to stop driving" Class Vehicles, and merely instructs owners to park vehicles outside and away from structures and other property "immediately."[31]

19.    The inconvenience suffered by Plaintiff and Class Members cannot be overstated. They are now forced to effectively isolate their Class Vehicles from structures and other vehicles. They can no longer safely park their Class Vehicles in their garage or next to their house, or park them near structures or other vehicles. As a result, they live with the fear of fires erupting in their Class Vehicle, potentially causing injury to themselves, other occupants, and damage to property.

**a. Ford Misrepresented the Class Vehicles as Safe in Labeling Required Under Federal Law**

20.    To sell vehicles in the United States, Ford must "certify to the distributor or dealer at delivery that the vehicle or equipment complies with applicable motor vehicle safety standards prescribed" by NHTSA under Chapter 301 of Title 49 of the U.S. Code. Pursuant to Chapter 301, Ford "may not issue the certificate if, in exercising reasonable care," it has "reason to know the certificate is false or misleading in a material respect." 49 U.S.C. § 30115; *see also* 49 U.S.C. § 30112. That safety certificate must be in a label permanently fixed to the vehicle, and thus all Class Vehicles have permanent labels certifying compliance with the NHTSA safety regulations prescribed under Chapter 301.

21.    Consumers reasonably relied on the safety assurances in the federally mandated labels. Those labels reasonably led Class Vehicle owners and lessees to believe that the Class Vehicles were safe and reliable, when, in reality, they were not.

---

[30] Exhibit A, *supra*, note 4; Owners of Lincoln Navigators have the option to request a loaner vehicle for up to two days when they have their vehicle serviced at a Lincoln dealership. *Id.; see also Service Simplified*, https://www.lincoln.com/support/category/service-maintenance/lincoln-pickup-and-delivery-service/ (last visited June 21, 2022).

[31] Exhibit A, *supra*, note 4.

22.    Had Plaintiff and Class Members known the truth about the risk of fire present in Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for the Class Vehicles.

**b. An Agency Relationship Exists Between Ford, on One Hand, and Ford and Lincoln Dealerships on the Other.**

23.    Upon information and belief, the Ford has impliedly or expressly acknowledged Ford– and Lincoln–authorized dealerships are its sales agents, the dealers have accepted that undertaking, Ford has the ability to control authorized Ford and Lincoln dealers, and Ford acts as the principal in that relationship, as is shown by the following:

    a.  without Ford, the relevant Ford and Lincoln dealers would not exist;

    b.  Ford is in the business of selling vehicles, as are its dealers;

    c.  the relationships are indefinite;

    d.  Ford can terminate the relationship with its dealers at will;

    e.  Ford supervises its dealers regularly;

    f.  Ford requires the following of its dealers:

        i.  reporting of sales;

        ii.  computer network connection with Ford;

        iii.  training of dealers' sales and technical staff;

        iv.  use of Ford-supplied computer software;

        v.  participation in Ford's training programs;

        vi.  establishment and maintenance of service departments in Ford and Lincoln dealerships;

        vii.  certification of Ford and Lincoln pre-owned vehicles;

        viii.  reporting to Ford with respect to the car delivery, including reporting Plaintiff's name, address, preferred title, primary and business phone numbers, email address, vehicle VIN number, delivery date, type of sale, lease/finance terms, factory incentive coding, if applicable,

vehicle's odometer reading, extended service contract sale designation, if any, and names of delivering dealership employees; and

    ix. displaying Ford and/or Lincoln logos on signs, literature, products, and brochures within Ford and Lincoln dealerships;

g. Ford further exercises control over its dealers with respect to:

    i. financial incentives given to dealer employees;

    ii. locations of dealers;

    iii. testing and certification of dealership personnel to ensure compliance with Ford policies and procedures; and

    iv. customer satisfaction surveys, pursuant to which Ford allocates the number of vehicles to each dealer, thereby directly controlling dealership profits;

h. Ford and Lincoln dealers are required to notify Ford whenever a car is sold or put into warranty service;

i. Ford provides tools and resources to help Ford and Lincoln dealers sell vehicles;

j. dealerships bind Ford with respect to:

    i. warranty repairs on the vehicles the dealers sell; and

    ii. issuing service contracts administered by Ford;

k. Ford and Lincoln dealers sell Ford vehicles on Ford's behalf, pursuant to a "floor plan," and Ford does not receive payment for its cars until the dealerships sell them;

l. dealerships bear Ford's brand names—Ford and/or Lincoln, use the Ford and/or Lincoln logos in advertising and on warranty repair orders, post Ford-branded signs for the public to see, and enjoy a franchise to sell Ford's products, including the Class Vehicles;

m. Ford requires Ford and Lincoln dealers to follow Ford's rules and policies in conducting all aspects of dealer business, including the delivery of

Ford's warranties described above, and the servicing of defective vehicles such as the Class Vehicles;

n.  Ford requires its dealers to post Ford's brand names (Ford and/or Lincoln), logos, and signs at dealer locations, including dealer service departments, and to identify themselves and to the public as authorized Ford and/or Lincoln dealers and servicing outlets for Ford and/or Lincoln vehicles;

o.  Ford requires its dealers to use service and repair forms containing Ford's brand names and logos;

p.  Ford requires Ford and Lincoln dealers to perform Ford's warranty diagnoses and repairs, and to do the diagnoses and repairs according to the procedures and policies set forth in writing by Ford;

q.  Ford requires Ford and Lincoln dealers to use parts and tools either provided or approved by Ford, and to inform Ford when dealers discover that unauthorized parts have been installed on one of Ford's vehicles;

r.  Ford requires dealers' service and repair employees to be trained by Ford in the methods of repairing vehicles manufactured by Ford;

s.  Ford audits Ford dealerships' sales and service departments and directly contacts the customers of said dealers to determine their level of satisfaction with the sale and repair services provided by the dealers; dealers are then granted financial incentives or reprimanded depending on the level of satisfaction;

t.  Ford requires its dealers to provide Ford with monthly statements and records pertaining, in part, to dealers' sales and servicing of Ford vehicles;

u.  Ford provides technical service bulletins and messages to its dealers detailing chronic defects present in product lines, and repair procedures to be followed for chronic defects;

v.  Ford provides its dealers with specially trained service and repair consultants with whom dealers are required by Ford to consult when dealers are unable to correct a vehicle defect on their own; and

w.  Ford requires Ford and Lincoln vehicle owners to go to authorized Ford and Lincoln dealers to obtain servicing under Ford warranties.

### c.  Plaintiff's Experience

*Michael Imhoff*

24.    On or around May 21, 2021, Plaintiff Imhoff purchased a new 2021 Ford Expedition from Kearny Mesa Ford, in San Diego, California.

25.    Plaintiff Imhoff purchased his Class Vehicle primarily for personal, family, or household use—especially for use on camping and road trips. Ford manufactured, sold, distributed, advertised, marketed, and warranted the vehicle.

26.    Since learning of the Defect, Plaintiff Imhoff has been highly concerned about the threat of harm the vehicle poses to his family, himself, and his property.

27.    As a result of his concerns about the safety threat the vehicle poses, Plaintiff Imhoff parks his vehicle at the end of his driveway—furthest away from his house. He is reluctant to part the vehicle on the street due to concerns of theft—and specifically theft of the vehicle's catalytic converters.[32]

28.    Plaintiff Imhoff has suffered a concrete injury as a result of Ford's misconduct and did not receive the full benefit of the bargain in acquiring the vehicle.

29.    As of the date of the filing of this Complaint, Ford alleges it has a remedy to fix Plaintiff's vehicle, but does not have the parts to perform the remedy and is not expected to have parts until September 2022.

30.    Had Plaintiff Imhoff known of the Defect, he would not have purchased the vehicle at all or would have paid substantially less for it.

---

[32] *See generally* Chloe Wynne, *Catalytic converter thefts sweep through San Diego, worrying residents*, inewsource (January 14, 2022), https://inewsource.org/2022/01/14/catalytic-converter-thefts/ (last visited June 27, 2022).

# V.     CLASS ACTION ALLEGATIONS

31.    Plaintiff brings this action individually and on behalf of a Nationwide Class and a California Subclass pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4). Plaintiff seeks certification of a Nationwide class, defined as follows:

> All persons in the United States who purchased or leased a
> Class Vehicle for personal use and not for resale
> (the "Nationwide Class").

32.    Pursuant to Fed. R. Civ. P. 23, and in the alternative to claims asserted on behalf of the Nationwide Class, Plaintiff asserts claims under the laws of the State of California, and on behalf of a separate statewide class, defined as follows:

> All persons in the State of California who purchased or
> leased a Class Vehicle for personal use and not for resale
> (the "California Subclass").

33.    Where appropriate, the Nationwide Class and California Subclass are collectively referred to as the "Class."

34.    Excluded from the proposed Classes are: Ford, any entity in which Ford has a controlling interest, is a parent or subsidiary, or which is controlled by Ford, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Ford, and judicial officers to whom this case is assigned and their immediate family members.

35.    Plaintiff reserves the right to amend the class definitions, including creating additional subclasses as necessary, after having had an opportunity to conduct discovery.

36.    Certification of Plaintiff's claims for class-wide treatment are appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

37.    The Class Members are ascertainable and readily identifiable from information and records in Ford's possession, custody, or control, as well as from records

kept by the Department of Motor Vehicles, which can be used for providing notice to Class Members.

38.    **Numerosity:** Consistent with Fed. R. Civ. P. 23(a)(1), although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court.

39.    **Commonality and Predominance:** Consistent with Fed. R. Civ. P. 23(a)(2) and 23(b)(3), this action involves common questions of law and fact predominating over any questions that may affect only individual Class Members. Adjudication of these common issues in a single action has important and desirable judicial economy advantages. Common legal and factual issues include:

    a.  whether Class Vehicles contained the Defect;

    b.  whether Ford engaged in unfair, unlawful, and/or deceptive business practices in selling and leasing to consumers Class Vehicles that are affected by the Defect;

    c.  whether Ford breached the implied warranty of merchantability relating to the defective nature of the Class Vehicles;

    d.  whether Class Vehicles suffered a diminution in value resulting from the Defect;

    e.  whether Ford was unjustly enriched by receiving monies in exchange for the defective Class Vehicles;

    f.  whether Ford should be ordered to disgorge all or part of the ill-gotten profits it received from the sale of the defective Class Vehicles;

    g.  whether Ford prioritized putting parts allegedly needed to repair the Defect into new vehicles instead of first repairing Class Vehicles;

    h.  whether Ford acted willfully and in wanton disregard of the consequences of its actions to consumers;

i.   whether Plaintiff and Class Members are entitled to damages, including compensatory, exemplary, and statutory damages, and the amount of such damages; and

j.   whether Plaintiff and Class Members are entitled to equitable relief, including an injunction enjoining Ford from engaging in the wrongful and unlawful conduct alleged herein.

40.   **Typicality:** Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiff's claims are typical of the claims of the Class Members in that Plaintiff, like all Class Members, purchased or leased a Class Vehicle designed and manufactured by Ford that is defective. The representative Plaintiff, like all Class Members, has been damaged by Ford's misconduct in that he possesses a vehicle that is unsafe and unfit for its intended purpose, has overpaid for the Class Vehicle, and has suffered or will suffer damages due to the diminished value of the Class Vehicle caused by the Defect. Furthermore, the factual bases of Ford's misconduct are common to all Class Members and represent a common thread resulting in injury to the Class as a whole. Plaintiff asserts the same claims and forms of relief as the Class.

41.   **Adequacy of Representation:** Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiff and counsel will fairly and adequately protect the interests of the Class. Plaintiff is a member of the Class defined herein; is committed to vigorously pursuing this matter against Defendant to obtain relief for the Class; and has no interests that are antagonistic to, or in conflict with, the interests of other Class Members. Plaintiff retained counsel who are competent and experienced in litigating class actions and complex litigation. Plaintiff and his counsel intend to vigorously prosecute this case, and will fairly and adequately protect the Class's interests.

42.   **Superiority:** Consistent with Fed. R. Civ. P. 23(b)(3), a class action is superior to other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered

individually by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Ford, making it impracticable for Class Members to individually seek redress for Ford's wrongful conduct. Even if Class Members could afford individual litigation, the court system should not be forced to shoulder such inefficiency. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

43.    Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3), because the common questions of law and fact predominate over any questions affecting individual Class Members, a class action is superior to other available methods for the fair and efficient adjudication of this controversy, and the requirements of Rule 23(a) are met.

44.    **Injunctive and Declaratory Relief.** Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2) because Ford, through its uniform conduct, acted or failed and refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole. Moreover, Ford has failed to repair the defect or extend Ford's warranties to cover the Defect and related work, and has not provided alternative modes of transportation (such as a loaner vehicle) or offered reimbursement for alternate modes of transportation while Ford investigates and repairs the vehicles. Ford has also not offered compensation for expenses related to parking Class Vehicles away from structures and property—as it instructed Class Members—in order to prevent structure and property damage as a result of the Defect. Ford has not been forced to change its practices or repair Class Vehicles in a timely manner, thus making injunctive relief a live issue and appropriate to the Class as a whole.

45.    Likewise, particular issues are also appropriate for certification under Fed. R. Civ. P. 23(c)(4) because the claims present particular, common issues, the resolution of

which would materially advance the resolution of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.   whether Class Vehicles contained the Defect;

    b.   whether Ford acted willfully and in wanton disregard of the consequences of its actions to consumers;

    c.   whether Ford adequately tested Class Vehicles to detect the Defect prior to sale;

    d.   whether the Defect was caused by Ford's design of the Class Vehicles;

    e.   whether Ford failed to comply with applicable laws, regulations, and/or industry standards relating to vehicle design, safety, and/or testing amounting to negligence.

## VI.    CAUSES OF ACTION

### COUNT I

**Breach of Implied Warranty Under the Magnuson-Moss Warranty Act 15 U.S.C. § 2303 *et seq*.**
**(On behalf of the Nationwide Class and California Subclass)**

46.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 45 as though fully stated herein.

47.    Plaintiff brings this count individually and on behalf of all Class Members.

48.    The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

49.    Plaintiff and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3)

50.    Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

51.    Ford provided all purchasers and lessees of the Class Vehicles with implied warranties.

52.     Ford impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. The implied warranty included, among other things: (i) a warranty that the Class Vehicles were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable vehicles for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use.

53.     Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are inherently defective and dangerous in that the Class Vehicles may erupt in flames.

54.     Ford's breach of implied warranties has deprived Plaintiff and Class Members of the benefit of their bargain.

55.     Plaintiff and Class Members have had sufficient direct dealings with either Ford or its agents (dealerships and technical support) to establish privity of contract between Ford, on one hand, and Plaintiff and each of the other Class Members on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the other Class Members are intended third-party beneficiaries of contracts between Ford and its dealers, and specifically, of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

56.     The amount in controversy of the individual claims of each Plaintiff and Class Member meets or exceeds the sum or value of $25.00. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

57.     Ford has been afforded a reasonable opportunity to cure its breach, by providing alternative vehicles to Plaintiff and Class members until Ford fixes the Defect.

58.    Additionally, pursuant to 15 U.S.C. § 2310(e), Plaintiff is entitled to bring this class action and is not required to give Ford notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiff pursuant to Rule 23 of the Federal Rules of Civil Procedure.

59.    As a direct and proximate cause of Ford's breach of express and implied warranties, Plaintiff and Class Members sustained damages and other losses in an amount to be determined at trial. Ford's conduct damaged Plaintiff and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

60.    As a result of Ford's violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiff and Class Members have incurred damages.

### COUNT II
### Unjust Enrichment or Quasi-Contract
**(On Behalf of the Nationwide Class and California Subclass)**

61.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 45 as though fully stated herein.

62.    Plaintiff brings this count individually and on behalf of all Class Members.

63.    Ford received and retained a benefit from Plaintiff and Class Members, and inequity has resulted.

64.    Ford benefitted through its unjust conduct by selling and leasing Class Vehicles with the Defect at a profit for more than the Class Vehicles were worth to Plaintiff and Class Members, who overpaid for these Class Vehicles with the Defect, and/or would not have purchased or leased Class Vehicles at all, and who have been forced to pay other costs.

65.    It is inequitable for Ford to retain these benefits.

66.    Plaintiff and Class Members do not have an adequate remedy at law.

67.    As a result of Ford's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

## COUNT III

**Breach of Implied Warranty**
**(On Behalf of the Nationwide Class and California Subclass)**

68.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 45 as though fully stated herein.

69.     Plaintiff brings this count individually and on behalf of all Class Members.

70.     Ford is and was at all relevant times a merchant with respect to vehicles and a seller of vehicles.

71.     The Class Vehicles are and were at all relevant times goods under the Uniform Commercial Code and individual state commercial codes.

72.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law. In addition, a warranty that the Class Vehicles were fit for their particular purpose is implied by law.

73.     Ford knew at the time of sale of the Class Vehicles that Plaintiff and Class Members intended to use the vehicles in a manner requiring a particular standard of performance and durability, and that Plaintiff and Class Members were relying on Ford's skill and judgment to furnish suitable products for this particular purpose.

74.     The Class Vehicles were and are not in merchantable condition, not fit for the ordinary purpose, and not fit for their particular purpose as a result of the Defect, as detailed above. Specifically, they are inherently defective and dangerous in that the Class Vehicles erupt in flames. This Defect renders the Class Vehicles unsafe and significantly reduces their value.

75.     As a direct and proximate result of Ford's breach of the implied warranties of merchantability and fitness for a particular purpose, Plaintiff and the members of the Class have been damaged in an amount to be proven at trial.

## COUNT IV

### Negligence
### (On Behalf of the Nationwide Class and California Subclass)

76.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 45 as though fully stated herein.

77.     Plaintiff brings this count individually and on behalf of all Class Members.

78.     Defendant owed a duty to consumers to exercise a degree of care that a reasonable person in the like position would exercise. Defendant failed to do so. Among other things Defendant had a duty to follow industry custom and standards imposed by federal regulations, to assess the foreseeability and likelihood of an injury, and to assess the seriousness and frequency of the injuries threatened by the Class Vehicles.

79.     Defendant breached its duty to Plaintiff and Class Members. Among other things, and without limiting the generality of the foregoing, Defendant failed to (1) adequately inspect Class Vehicles, (2) design Class Vehicles properly, and (3) adequately test Class Vehicles.

80.     Defendant's negligence was a substantial factor in causing Plaintiff and Class Members to suffer economic, and potentially physical harm, as well as other damages to be proven at the time of the trial.

81.     Plaintiff and Class Members were harmed because they were in fear and at risk of immediate catastrophic injury to themselves and passengers of the Class Vehicles, and people and property surrounding Class Vehicles.

82.     As a direct and legal result of Defendant's wrongful acts and omissions, Plaintiff and Class Members were harmed.

## COUNT V

### Violation of the Song-Beverly Consumer Warranty Act
### for Breach of Implied Warranties
### Cal. Civ. Code §§ 1791.1 and 1792
### (On Behalf of the California Subclass)

83. Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 45 as though fully stated herein.

84. Plaintiff brings this count individually and on behalf of all California Subclass Members.

85. The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

86. Ford is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

87. Ford impliedly warranted to Plaintiff and Class Members that Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) and 1792. However, Class Vehicles do not have the quality that a buyer would reasonably expect.

88. California Civil Code § 1791.1(a) states:

> "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:
>
> a. Pass without objection in the trade under the contract description.
>
> b. Are fit for the ordinary purposes for which such goods are used.
>
> c. Are adequately contained, packaged, and labeled.
>
> d. Conform to the promises or affirmations of fact made on the container or label.

89. Class Vehicles would not pass without objection in the trade of recreational vehicle sales because they are equipped with a defect that may cause Class Vehicles to erupt into flames. The Defect renders the Class Vehicles unsafe, and thus, not fit for ordinary purposes.

90.    The Class Vehicles are not adequately labeled because the labeling fails to disclose the Defect.

91.    Ford breached the implied warranty of merchantability by selling and leasing Class Vehicles equipped with the Defect. Furthermore, the Defect has prevented Plaintiff and Class Members from receiving the benefit of their bargain and caused Class Vehicles to greatly diminish in value.

92.    As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and Class Members received goods with a dangerous condition that substantially impairs their value.

93.    Plaintiff and Class Members have been damaged as a result of the diminished value of Class Vehicles.

94.    Under Cal. Civ. Code §§ 1791.1(d) and 1794, Plaintiff and Class Members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

95.    Under Cal. Civ. Code § 1794, Plaintiff and the Class Members are entitled to costs and attorneys' fees.

### COUNT VI
**Violation of California's False Advertising Law**
**Business & Professions Code Sections 17500,** *et seq.*
**(On Behalf of the California Subclass)**

96.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 45 as though fully stated herein.

97.    Plaintiff brings this count individually and on behalf of all California Subclass Members.

98.    Plaintiff, California Subclass Members, and Ford are "persons" within the meaning of Cal. Bus. & Prof. Code § 17506.

99.    California False Advertising Law ("California FAL") prohibits false advertising. (California Bus. & Prof. Code § 17500.)

100.    Defendant, in the course of its business, through its agents, employees, and/or subsidiaries, violated the California FAL by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of Class Vehicles.

101.    Defendant engaged in untrue and misleading advertising prohibited by California Bus. & Prof. Code § 17500 by misrepresenting Class Vehicles as being safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles.

102.    Defendant made, or caused to be made, and disseminated throughout California advertising, marketing, and other publications containing numerous statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendant, to be untrue and misleading to consumers, including Plaintiff and California Subclass Members. Examples of these statements and advertisements appear in the preceding paragraphs throughout this Complaint.

103.    Defendant's unfair or deceptive acts or practices, including its misrepresentations, concealments, omissions, and suppression of material facts, had a tendency and capacity to mislead and create a false impression in consumers, and were likely to—and did in fact—deceive reasonable consumers, including Plaintiff and California Subclass Members, about the true safety and reliability of Class Vehicles, the quality of Defendant's brands, and the true value of Class Vehicles.

104.    Defendant's scheme and concealment of the Defect and true characteristics of Class Vehicles were material to Plaintiff and California Subclass Members, as Defendant intended. Had Plaintiff and California Subclass Members known the truth, they would not have purchased or leased Class Vehicles, or would have paid significantly less for them.

105.    Plaintiff and California Subclass Members relied on Defendant and had no way of discerning that those representations were false and misleading, or otherwise

learning the facts that Defendant had concealed or failed to disclose. Plaintiff and California Subclass Members did not, and could not, unravel Defendant's deception on their own.

106.   Defendant had an ongoing duty to Plaintiff and the California Subclass to refrain from unfair or deceptive practices under the California FAL in the course of their business. Defendant owed Plaintiff and California Subclass Members a duty to disclose all material facts concerning the Defect in Class Vehicles because it possessed exclusive knowledge, it intentionally concealed the Defect from Plaintiff and California Subclass Members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

107.   Plaintiff and California Subclass Members suffered ascertainable losses and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

108.   Defendant's violations present a continuing risk to Plaintiff and California Subclass Members, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

109.   Plaintiff and California Subclass Members seek an order enjoining Defendant's false advertising, any such orders or judgments as may be necessary to restore Plaintiff and California Subclass Members any money acquired by unfair competition, including restitution and/or restitutionary disgorgement, and any other just and proper relief available under the false advertising provisions of the California FAL.

## COUNT VII
### Violation of the Consumer Legal Remedies Act
### Cal. Civ. Code § 1750, *et seq.*
### (On Behalf of the California Subclass)

110.   Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 45 as though fully stated herein.

111.   Plaintiff brings this count individually and on behalf of all California Subclass Members.

112. Class Vehicles are "goods" within the meaning of Cal. Civ. Code § 1761(a).

113. Plaintiff, California Subclass Members, and Defendant are "persons" within the meaning of Cal. Civ. Code § 1761(c).

114. Plaintiff and California Subclass Members are "consumers" within the meaning of Cal. Civ. Code § 1761(d).

115. The California Legal Remedies Act ("CLRA") prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer[.]" (Cal. Civ. Code § 1770.)

116. Defendant, in the course of its business, through its agents, employees, and/or subsidiaries, violated the CLRA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts relating to the reliability, safety, and performance of Class Vehicles, as detailed above.

117. Defendant engaged in one or more of the following unfair or deceptive business practices, as defined in Cal. Civ. Code § 1770(a), by misrepresenting Class Vehicles as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risks posed by Class Vehicles:

- representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have, in violation of Cal. Civ. Code § 1770(a)(5);

- representing that the Class Vehicles are of a particular standard, quality and grade when they are not, in violation of Cal. Civ. Code § 1770(a)(7);

- advertising the Class Vehicles with the intent not to sell or lease them as advertised, in violation of Cal. Civ. Code § 1770(a)(9); and

- representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not, in violation of Cal. Civ. Code § 1770(a)(16).

118.    Defendant's unfair or deceptive acts or practices, including its misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to—and did in fact—deceive reasonable consumers, including Plaintiff and California Subclass Members, and about the true safety and reliability of Class Vehicles, the quality of Class Vehicles, and the true value of Class Vehicles.

119.    Defendant's scheme and concealment of the Defect and true characteristics of Class Vehicles were material to Plaintiff and California Subclass Members, as Defendant intended. Had Plaintiffs and California Subclass Members known the truth, they would not have purchased or leased their Class Vehicles or would have paid significantly less for them.

120.    Plaintiff and California Subclass Members had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose. Plaintiff and California Subclass Members did not, and could not, unravel Defendant's deception on their own.

121.    Defendant had an ongoing duty to Plaintiff and California Subclass Members to refrain from unfair or deceptive practices under the CLRA in the course of its business. Defendant owed Plaintiff and California Subclass Members a duty to disclose all the material facts concerning the Defect in Class Vehicles because it possessed exclusive knowledge, it intentionally concealed the Defect from Plaintiff and California Subclass Members, and/or it made representations that were rendered misleading because they were contradicted by withheld facts.

122.    Plaintiff and California Subclass Members suffered ascertainable losses and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

123.    Defendant's violations present a continuing risk to Plaintiff and California Subclass Members, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

124.    Defendant was provided notice of the issues raised in this count and this Complaint by at least 21 separate reports of underhood fires in Class Vehicles, as referenced above.

125.    Pursuant to Cal. Civ. Code § 1780(a), Plaintiff and the California Subclass Members seek an order enjoining Defendant's unfair or deceptive acts or practices and awarding actual damages, treble damages, restitution, attorneys' fees, and any other just and proper relief available under the CLRA against Defendant.

126.    Pursuant to Cal. Civ. Code § 1782(a), Plaintiff sent a letter to Defendant concurrently with the filing of this Complaint notifying Defendant of their CLRA violations and affording it the opportunity to correct its business practices and rectify the harm is caused. Plaintiff sent the CLRA notice via certified mail, return receipt requested, to Ford's principal place of business. Should Defendant fail to correct its business practices or provide the relief requested within 30 days, Plaintiff will amend this Complaint to seek monetary damages under CLRA.

## COUNT VIII
### Failure to Recall/Retrofit
### (On Behalf of the California Subclass)

127.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 45 as though fully stated herein.

128.    Plaintiff brings this count individually and on behalf of all California Subclass Members.

129.    Defendant manufactured, marketed, distributed, sold, or otherwise placed into the stream of commerce.

130.    Defendant knew, or reasonably should have known, that Class Vehicles were dangerous when used in a reasonably foreseeable manner and posed an unreasonable safety risk.

131.    Defendant became aware Class Vehicles were dangerous when used in a reasonably foreseeable manner and posed an unreasonable risk after Class Vehicles were sold.

132.    Defendant failed to recall Class Vehicles in a timely manner, and its 2022 Recall was ineffective because it did not mitigate or otherwise resolve the Defect.

133.    A reasonable manufacturer in same or similar circumstances would have timely and properly recalled the Class Vehicles.

134.    Plaintiff and Class Members were harmed by Defendant's failure to recall the Class Vehicles properly and in a timely manner and, as a result, have suffered damages, including out-of-pocket costs, losses and inconvenience expended in complying with an inadequate recall, and caused by Defendant's ongoing failure to properly recall, retrofit, and fully repair Class Vehicles.

135.    Defendant's failure to timely recall Class Vehicles was a substantial factor in causing the harm to Plaintiff and Class Members as alleged herein.

### COUNT IX
**Violation of California's Unfair Competition Law
Cal. Bus. & Prof. Code § 17200, *et seq.*
(On behalf of the California Subclass)**

136.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 45 as though fully stated herein.

137.    Plaintiff brings this count individually and on behalf of all California Subclass Members.

138.    California's Unfair Competition Law ("UCL"), California Business and Professions Code § 17200, *et seq.*, prohibits any "unlawful, unfair or fraudulent business act or practices."

139.    In the course of its business, Ford violated the UCL by engaging in the following unlawful and unfair business acts and practices:

   a.    selling and leasing a Class Vehicle with a defect rendering the vehicle unsafe and unfit for normal use;

   b.  breaching California statutory and common law implied warranties
       associated with the Class Vehicles;

   c.  failing to adequately fix, repair, or otherwise remediate the Defect in
       Class Vehicles;

140.   Had Plaintiff and California Subclass Members known of the Defect, they would not have purchased or leased the Class Vehicles or would have paid significantly less for them.

141.   Plaintiff and California Subclass Members suffered an ascertainable loss of money and property as a direct and proximate result of Ford's violations of the UCL, as set forth above.

142.   Pursuant to Cal. Bus. & Prof. Code § 17200, *et seq.*, Plaintiff and California Subclass Members seek any such orders or judgments as may be necessary to restore to Plaintiff and California Subclass Members any money acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203, and any other just and proper relief available under the UCL.

143.   Further, Plaintiff and California Subclass Members request injunctive relief to remedy the violations of the UCL by Defendant, including a full repair of the Defect and replacement of all necessary parts, an extension of the warranties for Class Vehicles so that all repairs and parts replacements related to the Defect are covered by such warranties and do not result in out-of-pocket costs to Plaintiff and California Subclass Members, the provision of loaner vehicles while the work to correct the Defect is being performed, and all other applicable relief.

144.   Plaintiff and California Subclass Members currently lack an adequate remedy at law for all the harms caused by the Defect. Only through injunctive and restitutionary relief will Plaintiff and California Subclass Members be able to obtain a complete repair of the defect and an extension of Ford's warranties to cover that work, as well as restitution of the monies Plaintiff and California Subclass Members have already spent in efforts to: repair the Class Vehicles, find alternative modes of transportation, park Class

Vehicles away from structures and property, prevent future fires, and repair or replace items damaged by the Defect.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually, and on behalf of the members of the Class, prays for relief as follows:

a. an order certifying the proposed Nationwide Class and California Subclass, designating Plaintiff as the named representative of the Nationwide Class and California Subclass, and designating his attorneys as Class Counsel;

b. a declaration that Ford is financially responsible for adequately notifying all Class Members about the defective nature of Class Vehicles;

c. an award to Plaintiff and Class Members of compensatory, exemplary, and statutory damages, in an amount to be proven at trial;

d. for restitution of all money or property wrongfully obtained by Ford;

e. for disgorgement, for the benefit of the Class, all or part of the ill-gotten profits;

f. an award of attorneys' fees and costs pursuant to California Code of Civil Procedure § 1021.5, or as otherwise allowed by law;

g. an award of pre-judgment and post-judgment interest, as provided by law;

h. leave to amend the Complaint to conform to the evidence produced at trial; and

i. such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by jury.

Dated: July 13, 2022

Respectfully submitted,

**CASEY GERRY SCHENK FRANCAVILLA
  BLATT & PENFIELD, LLP**

By:    /s/ *Gayle M. Blatt*
       GAYLE M. BLATT
       *Attorneys for Plaintiff*

CLASS ACTION COMPLAINT